UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | |
| ) | |
| GREGG D. CAPLITZ AND INSIGHT ONSITE STRATEGIC MANAGEMENT, LLC Defendants, ) ) ) | JURY TRIAL DEMANDED |
| ) | |
| and ) | |
| ) | |
| ROSALIND HERMAN, BRIAN HERMAN, BRAD HERMAN, CHARLENE HERMAN, and THE KNEW FINANCE EXPERTS, INC. ) ) ) | |
| ) | |
| Relief Defendants. ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants Gregg D. Caplitz ("Caplitz") and Insight Onsite Strategic Management, LLC

("IOSM") (collectively, "Defendants") and relief defendants Rosalind Herman, Brian Herman,

Brad Herman and Charlene Herman (collectively, "the Hermans") and The Knew Finance

Experts, Inc. ("Knew Finance" and collectively, with the Hermans, the "Relief Defendants"):

## SUMMARY

1.      This case involves an investment adviser's theft of assets from his clients and

others. On information and belief, the scheme described herein may have raised approximately

$1,100,000 from at least twelve of Caplitz and IOSM's advisory clients and others. Caplitz and

IOSM employed a fraudulent scheme, and made and used false and misleading statements, in

connection with the offer and sale of shares in a purported hedge fund named the Insight Onsite Strategic Fund, LP, (the "Insight Onsite Fund") and/or the offer and sale of membership interests in Insight Onsite Strategic Partners, LLC ("Insight Onsite Partners"), which was purportedly to serve as the general partner of the Insight Onsite Fund.  Caplitz and IOSM schemed to defraud investors by promising them that they would be invested in either the Insight Onsite Fund or that they would be investors in Insight Onsite Partners, which would earn management fees from managing and operating the Insight Onsite Fund.  Many of the investors that Caplitz and IOSM targeted when soliciting these investments were already advisory clients of Caplitz and IOSM. Once an investor agreed to invest in the Insight Onsite Fund or Insight Onsite Partners, Caplitz directed them to send money to a bank account in the name of IOSM, or to an account in the name of another entity, The Knew Finance Experts ("Knew Finance").  Caplitz had represented to several investors that Knew Finance would also be involved in managing the Insight Onsite Fund.

2.      In order to make their purported investments in the Insight Onsite Fund and/or Insight Onsite Partners, certain of the investors authorized Caplitz and/or IOSM to liquidate securities they held in their individual retirement accounts.  Instead of using the investors' funds to purchase shares in a hedge fund, or using their funds for legitimate purposes to manage or develop a hedge fund, Caplitz and/or IOSM transferred control over the investors' funds to the Relief Defendants, who used the funds largely for their own personal expenses.  Caplitz also obtained funds from a real estate investment trust by falsely representing that a hedge fund he operated was interested in making an investment in that trust.

3.      By engaging in the conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of

2

1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act").

4. Based on these violations, the Commission seeks: (1) entry of a preliminary injunction, order freezing assets, and order for other equitable relief in the form submitted with the Commission's ex parte motion for such relief; (2) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws; (3) disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; (4) disgorgement by the Relief Defendants of all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest; and (5) the imposition of a civil monetary penalty due to the egregious nature of Defendants' violations.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9]. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because a substantial part of the acts constituting the alleged violations occurred in the District of Massachusetts and because Caplitz lives in Massachusetts and the principal place of business of Insight Onsite is in Massachusetts.

7.      In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

8.      Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

9.      Unless enjoined, Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS and RELIEF DEFENDANTS

10.     Gregg D. Caplitz, age 54, is an individual residing at 119 Marion St., Wilmington, Massachusetts. For at least 20 years, Caplitz has been in the business of providing investment advice to individual and small business clients. He is a registered representative of a brokerage firm and holds several securities licenses. Caplitz is also the Chief Compliance Officer of IOSM.

11.     IOSM is an investment adviser registered with the Commission. It is a Delaware limited liability company with a primary place of business at 119 Marion St., Wilmington, Massachusetts.

12.     Rosalind Herman, age 57, is an individual residing at 10916 Summer Quail Ave., Las Vegas, Nevada. Herman is the Chief Investment Officer of IOSM. She is also the managing member of the sole shareholder of IOSM, an entity named Financial Family Holdings, LLC. She previously resided in Massachusetts.

4

13.     Brian Herman, age 34, is an individual residing at 10916 Summer Quail Ave., Las Vegas, Nevada. Brian Herman is the son of Rosalind Herman. He has signatory authority on bank accounts held in the name of IOSM and The Knew Finance Experts, Inc.

14.     Brad Herman, age 29, is an individual residing at 10916 Summer Quail Ave., Las Vegas, Nevada. Brad Herman is the son of Rosalind Herman. He has signatory authority on bank accounts held in the name of The Knew Finance Experts, Inc.

15.     Charlene Herman, age 31, is an individual residing at 10916 Summer Quail Ave., Las Vegas, Nevada. Charlene Herman is the wife of Brian Herman. She has signatory authority on bank accounts held in the name of The Knew Finance Experts, Inc.

16.     The Knew Finance Experts, Inc.("Knew Finance") is a Nevada corporation with a principal place of business at 10916 Summer Quail Ave., Las Vegas, Nevada. Brian Herman is the President and a Director of Knew Finance. Brad Herman is the Secretary and a Director of Knew Finance. Charlene Herman is the Treasurer of Knew Finance. Rosalind Herman is a Director of Knew Finance.

## FACTUAL ALLEGATIONS

17.     Caplitz has been providing investment advice and tax planning services to clients for at least twenty years. Many of his clients are individuals and small businesses who are not sophisticated investors.

18.     Caplitz and Herman have been engaged in business endeavors together for many years, beginning when she lived in Massachusetts.

19.     Over the years, Caplitz has been a registered representative of numerous broker-dealers and has provided his investment advice, financial planning, and tax planning services

through a number of entities, including Insight Onsite Financial Solutions, Financial Resources Network, Inc., and Alternative Wealth Strategies.

20.     Beginning in at least 2009, Caplitz began soliciting investments in the Insight Onsite Fund and/or Insight Onsite Partners, an entity that he said would own and manage the Insight Onsite Fund. Despite Caplitz's representations to the contrary, the Insight Onsite Fund and Insight Onsite Partners were essentially vehicles to funnel money to the Relief Defendants.

21.     The Insight Onsite Fund does not have any assets. Because it is an investment adviser registered with the Commission, IOSM must file Form ADV, which reports certain facts about its business. The most recent form ADV filed by IOSM, dated June 29, 2012 and signed by Rosalind Herman, reports that IOSM is the investment manager for the Insight Onsite Fund and that assets of the Insight Onsite Fund are held with a third party that serves as the prime broker and custodian for the fund. In fact, that third party holds no assets for the Insight Onsite Fund and has never engaged in securities trades for the Insight Onsite Fund.

22.     IOSM's June 2012 Form ADV also reports that IOSM has more than $100 million in assets under its management. The Form ADV also lists the third party firm that serves as the custodian of those assets.

23.     On information and belief, Insight Onsite Partners has not engaged in legitimate business activities in its role as the general partner of the Insight Onsite Fund.

24.     Caplitz solicited and obtained investments in the Insight Onsight Fund and/or Insight Onsite Partners from at least two individuals who were his investment advisory clients. Caplitz appears to have withdrawn money for Insight Onsite Partners and/or IOSM from the retirement account of at least two other of his investment advisory clients without those clients' understanding or approval. On information and belief, Caplitz solicited similar investments in

6

the Insight Onsite Fund and/or Insight Onsite Partners from some of his other advisory clients.
On information and belief, the scheme described herein may have raised at least approximately
$980,000 from at least twelve of Caplitz and IOSM's advisory clients.

**Client A**

25.  Caplitz met with Client A in early 2009. Caplitz convinced Client A and his wife
to invest $275,000 in a hedge fund that Caplitz said would generate returns of about $1,000 per
month. Caplitz told Investor A that he was buying 3 or 3.5 shares or units of the hedge fund.
Caplitz represented that a share usually could be purchased for $100,000 and that Client A was
thus getting a discount on 3 or 3.5 shares (which would ordinarily cost $300,000 or $350,000).

26.  At Caplitz's direction, Client A wired at least $175,000 from his bank accounts to
a bank account in the name of Knew Finance. These wires were sent on February 25, 2009, May
18, 2009 and May 20, 2009. Caplitz's representations about the use to which Client A's funds
would be put were false. Client A's funds were not invested in a hedge fund and were not used
to develop or operate a hedge fund through Insight Onsite Partners.

27.  Caplitz also provided Client A with the Limited Liability Agreement for Insight
Onsite Partners as the documentation for his investment in the hedge fund. That agreement
provides that Client A is a member of Insight Onsite Partners LLC, with a three percent
membership interest and a total capital contribution of $3. The Insight Onsite Partners LLC
Agreement provides that the entity's purpose is to serve as the general partner of the Insight
Onsite Fund, in addition to other lawful business purposes.

28.  In purchasing shares in Insight Onsite Partners, Client A purchased an investment
contract because he was investing money in what purported to be a common enterprise that
involves the pooling of assets from multiple investors so that all share in the profits and risks of

7

the enterprise, with the expectation of profits that will be derived solely from the efforts of Insight Onsite Partners' managing member (Financial Family Holdings, LLC, whose managing member is Rosalind Herman) and the Insight Onsite Fund.

29.     On at least three occasions, Caplitz prepared and gave to Client A a spreadsheet that summarized all of Client A's investments that Caplitz managed, and on one of the spreadsheets, summarized the management fees that Client A paid to Caplitz. These spreadsheets purported to value Client A's investments in Insight Onsite Partners as of June 30, 2011, March 31, 2012, and October 31, 2012. On each of the three spreadsheets, Caplitz represented that each of Client A's shares of Insight Onsite Partners was worth $250,000.

30.     Upon information and belief, Caplitz's representations about the value of Client A's shares in Insight Onsite Partners were false. At the times he gave those spreadsheets to Client A, Caplitz knew or had reason to know, or was reckless in not knowing, that the money invested by Client A had been spent largely to fund the personal expenses of Caplitz and the Hermans.

31.     In fact, when Knew Finance received the $100,000 wire from Client A in February 2009, $68,000 of that money was dissipated within a month of its receipt. On information and belief, the majority of that $68,000 was spent to fund the personal living expenses of the Hermans. In particular, more than $36,000 was withdrawn by Brian or Brad Herman either in cash or checks written to them.

32.     When Client A sent an additional $75,000 to Knew Finance in May 2009, nearly that entire sum was withdrawn by the end of May. More than $5,400 of those funds were paid directly to Brian or Brad Herman, approximately $3,600 was paid to Caplitz, and $21,000 was

paid to an attorney representing Caplitz, Rosalind Herman and other entities affiliated with them in litigation not connected to the Insight Onsite Fund or Insight Onsite Partners.

**Client B**

33.     Caplitz met with Client B in or around October or November 2010. Caplitz convinced Client B and his partner to invest $100,000 to become a part owner of a hedge fund that Caplitz said would generate returns once every year in January, starting in January 2012. At Caplitz's direction, Client B wired $100,000 from his bank account to a bank account in the name of Knew Finance on November 9, 2010.

34.     Caplitz also provided Client B with the Limited Liability Agreement for Insight Onsite Partners as the documentation for his investment in the hedge fund. That agreement provides that Client B is a member of the Insight Onsite Partners LLC with a one percent membership interest and a total capital contribution of $1.

35.     Caplitz misrepresented the use to which Client B's funds would be put. As Caplitz knew or should have known, or was reckless in not knowing, the majority of those funds were spent on Caplitz's and the Hermans' personal expenses. Within a month of Client B's $100,000 wire into the Knew Finance account, more than $73,000 of those funds had been dissipated. In particular, on the same day that Client B's funds were received, $60,000 of those funds were wired to an attorney representing Caplitz, Rosalind Herman and other entities affiliated with them in litigation not connected to the Insight Onsite Fund or Insight Onsite Partners. In addition, more than $2,000 was withdrawn from ATMs, an additional $4,350 was withdrawn by Brian or Brad Herman either in cash or checks written to them, and numerous point of sale debits were made at merchants including gas stations, drug stores and home goods stores.

36.     After Client B did not receive a return on his investment in January 2012, he began to ask Caplitz when he would to be paid a return on his investment. Caplitz told Client B on a number of occasions between March and June 2012 that a check would be coming soon. Client B also spoke with Caplitz and with Rosalind Herman in June and July 2012 and was told again that a check was coming soon, and was eventually told that the check would be for $10,000.

37.     When Client B finally received a check from Caplitz and Herman, on or about July 23, 2012, the check was for $3,000, which was less than Client B had been told to expect. Also, at the top of the check was written the word "Gift" and the memo line of the check read "Thank you Enjoy the gift." The check thus appeared not to be the promised return on Client B's investment.

38.     In addition, Caplitz told Client B in or about May 2012 that the hedge fund was partially funded. On information and belief, that statement was a misrepresentation, as Caplitz knew or should have known, or was reckless in not knowing.

**Client C**

39.     Caplitz has served as an investment adviser to Client C for approximately twenty years. Caplitz advises Client C with respect to two accounts that are held in her name at a brokerage firm, an individual retirement account and a trust account. Caplitz has discretionary authority over both of those accounts.

40.     In 2012, Caplitz solicited Client C to invest in a hedge fund. After considering Caplitz's sales pitch, Client C decided not to invest in the hedge fund because she considered it too risky of an investment for someone of her age.

41.    Despite Client C's refusal to invest in the hedge fund he was pitching, Caplitz apparently took action to obtain funds from Client C.  On at least two dates, funds from Client C's IRA account were wired to an IOSM bank account: $2,600 was wired on February 11, 2013, and $28,000 was wired on March 4, 2013.  Client C was not aware of, and did not authorize these transfers.

42.    In connection with the March 4, 2013 wire, Caplitz sent to Client C's brokerage firm an IRA Distribution Request form purportedly signed by Client C.  This Distribution Request Form purportedly authorized the transfer of $28,000 from Client C's IRA account to a bank account in IOSM's name.  This Distribution Request Form states that the "type of IRA account receiving" the funds is "Normal," and that the funds are for "further credit to" Client C. Client C has no memory of authorizing this distribution, even though the form purports to contain her signature.  These funds were not put into a "normal" IRA account for the benefit of Client D, as the IRA Distribution Request Forms represented they would be.  Instead, the funds went into IOSM's bank account and have been at least partially liquidated.

43.    In February 2013, the month in which $2,600 from Client C's IRA Account was wired into IOSM's bank account, along with $14,000 from Client D as discussed in paragraph 54 below, about $12,000 was spent from that account.  A substantial portion of those $12,000 in payments appear to have been made for the personal expenses of the Hermans.  In particular, approximately $1,700 was withdrawn from ATMs, and numerous point of sale debits were made at merchants including gas stations, fast food restaurants, liquor stores, parking lots and grocery stores.

**Client D**

44.     Caplitz has served as an investment adviser to Client D for a number of years. Among other accounts on which Caplitz advises Client D is Client D's individual retirement account held at a brokerage firm (the "IRA Account").

45.     In 2012 and 2013, several withdrawals were made from Client D's IRA Account without Client D's knowledge or authorization.  Caplitz sent to the brokerage firm IRA Distribution Request forms purportedly signed by Client D.  These Distribution Request Forms purportedly authorized the transfer from the IRA Account to a bank account in IOSM's name of the following amounts: $7,600 on March 4, 2013, $4,500 on February 11, 2013; $9,500 on February 1, 2013, $1,650 on January 24, 2013, $5,000 on January 17, 2013, and $51,000 on March 8, 2012.  These Distribution Request Forms state that the "type of IRA account receiving" the funds is "Normal," and that the funds are for "further credit to" Client D.  Client D has no memory of authorizing these distributions, even though the forms purport to contain his signature.

46.     Wires totaling $141,600 were sent from Client D's IRA Account into an IOSM bank account.  These wires were made in the following amounts:  $7,600 on March 4, 2013, $4,500 on February 11, 2013; $9,500 on February 1, 2013, $1,650 on January 24, 2013, $8,350 on January 18, 2013, $8,000 on September 17, 2012, $51,000 on June 12, 2012, and $51,000 on March 8, 2012.

47.     Some of these outgoing wires from Client D's IRA Account were funded by the liquidation of securities held in the IRA Account.  These funds were not put into a "normal" IRA account for the benefit of Client D, as the IRA Distribution Request Forms represented they would be.

12

48.     Client D did not authorize Caplitz to take money from his IRA Account to invest either in a hedge fund or in the general partner of a hedge fund. Client D does not understand what a hedge fund is.

49.     At some point in time before March 2012, Client D signed a signature page that Caplitz provided to him and asked him to sign. Client D was not provided with the rest of the document and does not understand what he signed. The signature page appears to be that of the Insight Onsite Partners LLC Agreement, and similar to the signature pages that Clients A and B were given.

50.     In March 2012, the month in which $51,000 from Client D's IRA Account was wired into IOSM's bank account, IOSM also received $56,000 from two other investment advisory clients of Caplitz and IOSM that appear to be purchases of membership interests in Insight Onsite Partners. In total, of the approximately $107,000 received by IOSM to purchase membership interests in Insight Onsite Partners that month, about $50,000 was spent that month, and a substantial portion of those payments appear to have been made for the personal expenses of the Hermans. In particular, $10,000 was paid to an attorney representing Rosalind Herman in a pending criminal case, more than $5,700 was withdrawn from ATMs, more than $3,800 was withdrawn by Brian or Brad Herman either in cash or checks written to them, and numerous point of sale debits were made at merchants including gas stations, drug stores, fast food restaurants and toy stores.

51.     In June 2012, the month in which another $51,000 from Client D's IRA Account was wired into IOSM's bank account, approximately $56,000 was spent, and a substantial portion of those payments appear to have been made for the personal expenses of Caplitz and the Hermans. In particular, $20,000 of those funds were paid to an attorney representing Caplitz,

Rosalind Herman and other entities affiliated with them in litigation not connected to the Insight Onsite Fund or Insight Onsite Partners, $15,000 was paid to an attorney representing Rosalind Herman in a pending criminal case, more than $3,500 was withdrawn from ATMs, and numerous point of sale debits were made at merchants including online music downloading sites, gas stations, fast food restaurants and grocery stores.

52.    In September 2012, the month in which $8,000 from Client D's IRA Account was wired into IOSM's bank account, along with approximately $11,000 from Client A, approximately $18,000 was spent, and a substantial portion of those payments appear to have been made for the personal expenses of the Hermans.  In particular, more than $5,270 was withdrawn from ATMs (many of which were ATMs at casinos), and numerous point of sale debits were made at merchants including gas stations, fast food restaurants, satellite television providers, and home goods stores.

53.    In January 2013, the month in which $10,000 from Client D's IRA Account was wired into IOSM's bank account, approximately $10,900 was spent, and a substantial portion of those payments appear to have been made for the personal expenses of the Hermans.  In particular, approximately $560 was withdrawn from ATMs, and numerous point of sale debits were made at a casino, for utility payments, and at merchants including gas stations, fast food restaurants and grocery stores.

54.    In February 2013, the month in which $14,000 from Client D's IRA Account was wired into IOSM's bank account, along with $2,600 from Client C as discussed in paragraph 43 above, about $12,000 was spent from that account.  As described in paragraph 43 above, a substantial portion of those payments appear to have been made for the personal expenses of the Hermans.

**Caplitz's Misrepresentations to a Real Estate Investment Trust**

55.     In June 2011, Caplitz called the President of a public non-traded Real Estate Investment Trust ("REIT") in whose securities offerings Caplitz had previously invested money for some of his investment advisory clients.

56.     During that telephone call, Caplitz told the REIT's President that he was operating a hedge fund and that he was contemplating investing $5 million of the hedge fund's assets into an offering by the REIT. Caplitz asked that the REIT provide his hedge fund with $135,000 to perform due diligence on the REIT before making his investment. The REIT occasionally made this type of up-front payment for due diligence to potential investors in its securities offerings.

57.     On June 29, 2011, pursuant to Caplitz's instructions, the REIT wired $135,000 to an IOSM bank account. Neither Caplitz, nor the Insight Onsite Fund, nor Insight Onsite Partners ever invested any money in the REIT's securities offering after receiving the wire for $135,000 on June 29, 2011.

58.     On information and belief, the $135,000 that the REIT sent to IOSM was not used to perform due diligence on the REIT. Instead, the majority of those funds appear to have been spent for the personal expenses of Caplitz and the Hermans. In June 2011, the month in which IOSM received the REIT's $135,000 payment, a total of $240,000 was deposited into IOSM's bank account, and a total of $211,000 was withdrawn. On information and belief, a substantial portion of the $211,000 that was withdrawn was spent to fund the personal living expenses of Caplitz and the Hermans. In particular, $50,000 was wired to an attorney representing Caplitz, Rosalind Herman and other entities affiliated with them in litigation not connected to the Insight Onsite Fund or Insight Onsite Partners, $60,350 was transferred to the Knew Finance account at

the same bank, approximately $4,000 was withdrawn by Brian, Brad or Charlene Herman either in cash or checks written to them, and numerous point of sale debits were made at merchants including grocery stores, gas stations, and fast food restaurants.

## First Claim for Relief
### (Violation of Section 17(a) of Securities Act By Defendants)

59.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 58 above as if set forth fully herein.

60.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (c) have engaged or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

61.     By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## Second Claim for Relief
### (Violation of Section 10(b) of Exchange Act and Rule 10b-5 By Defendants)

62.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 58 above as if set forth fully herein.

63.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) have

employed or are employing devices, schemes, or artifices to defraud; (b) have made or are

making untrue statements of material fact or have omitted or are omitting to state material fact(s)

necessary to make the statements made not misleading; or (c) have engaged or are engaging in

acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

64.    By engaging in the conduct described above, Defendants have violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### Third Claim for Relief
### (Violation of Section 206(1) of Advisers Act By Defendants)

65.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 58 above as if set forth fully herein.

66.    At all times relevant to this Complaint, the Defendants acted as investment

advisers to Clients A, B, C, and D, and other similarly situated clients.

67.    Defendants, while acting as investment advisers, by use of the mails, and the

means and instrumentalities of interstate commerce, directly or indirectly, employed devices,

schemes or artifices to defraud their clients or prospective clients.

68.    At all times relevant to this Complaint, the Defendants acted with scienter.

69.    By engaging in the conduct described above, Defendants have violated, and

unless enjoined will continue to violate, Section 206(1) of the Advisers Act  [15 U.S.C. §80b-

6(1)].

### Fourth Claim for Relief
### (Violation of Section 206(2) of Advisers Act By Defendants)

70.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 58 above as if set forth fully herein.

71.     At all times relevant to this Complaint, the Defendants acted as investment advisers to Clients A, B, C, and D, and other similarly situated clients..

72.     Defendants, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon their clients or prospective clients.

73.     By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

## Fifth Claim for Relief
### (Other Equitable Relief, Including Unjust Enrichment and Constructive Trust, Against Relief Defendants)

74.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 58 above as if set forth fully herein.

75.     Section 21(d)(5) of the Exchange Act states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

76.     On information and belief, the Relief Defendants have received and possess ill-gotten investor funds derived from the unlawful acts or practices of the Defendants dictating that, in equity and good conscience, they should not be allowed to retain such funds.

77.     Relief Defendants have no legitimate claim to this property.

78.     As a result, the Relief Defendants are liable for unjust enrichment and should be required to return its ill-gotten gains, in an amount to be determined by the Court. The Court

should also impose a constructive trust on the ill-gotten investor funds in the possession of the Relief Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a temporary restraining order, order freezing assets, and order for other equitable relief in the form submitted with the Commission's *ex parte* motion for such relief, and, upon further motion, enter a comparable preliminary injunction, order freezing assets, and order for other equitable relief;

B.    Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)];

C.    Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.    Require the Relief Defendants to disgorge all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest, with said moneys to be distributed in accordance with a plan of distribution to be ordered by the Court;

E.      Require Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)]; and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

F.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

Mayeti Gametchu (Mass. Bar No. 647787)
Kathleen Burdette Shields (Mass. Bar No. 637438)
Kevin M. Kelcourse (Mass. Bar No. 643163)
Susan Anderson (D.C. Bar No. 978173)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8921 (Gametchu direct)
Facsimile:  (617) 573-4590
E-mail:  GametchuM@sec.gov

Dated:  March 15, 2013